MARY R. MILES ET AL. v. THEUS N. MILES ET AL.

1. DEEDS. *Description. Name of tract. Reformation. Evidence.*

A deed to a plantation describing the same by its well-known name, although reciting that it consisted of certain lands designated by government survey descriptions, aided by proof that the grantee, with the knowledge and consent of the grantor, entered into the possession of the lands which had previously passed as a part of the plantation, warrants the conclusion that the grantor intended to convey all of said lands and may be reformed so as to specifically include a part thereof not described therein by survey descriptions.

2. SAME. *Intentional use of mistaken terms.*

The description of land in a deed may be reformed so as to embrace the tract sought to be conveyed, although the parties intentionally used the terms of description as written in the deed, if they did so under the mistaken impression that they properly described the tract.

3. SAME. *Consideration. Volunteers.*

The grantees in a deed, supported in part by a valuable consideration, are not mere volunteers, and are not precluded from hav-

ing the deed reformed, although the entire consideration may not have been a valuable one.

4. SAME.    *Concrete case.*

Where a deed from a grantor to his son was a part of the transaction by which a family settlement was arranged and perfected, and the purchase by such son of his brother's interest was a part of the consideration moving the grantor to divide the property, a court of equity will reform the deed to effectuate the intention of the parties, as they occupied the position of persons who had inherited the property, undertaken to divide it, and a mutual mistake had occurred.

FROM the chancery court of Holmes county.

HON. ADAM M. BYRD, Chancellor.

Theus N. Miles and others, appellees, were complainants in the court below; Mary R. Miles and others, appellants, were defendants there. From a decree in complainants' favor the defendants appealed to the supreme court.

This suit began by an original bill to reform a deed to appellees, executed July 1, 1897, by Gen. W. R. Miles, to certain lands and personalty—lands described by sectional numbers, constituting, as declared by the deed, the Quofoloma and Omega plantations—by adding to the sectional numbers used in the deed all of section 33 within the curvature of Horseshoe Lake, containing 110 acres, upon the claim that it was a part of Quofoloma. Besides reformation, perpetual injunction was asked against appellant, Mrs. Mary R. Miles, to whom Gen. William R. Miles, by will, had devised, along with other property, the Good Hope plantation, in consideration of $25,000 obtained by him from her in 1895; the Good Hope plantation, as recited in the will, consisting of all of section 33 and other lands. Gen. Miles on July 1, 1897, was eighty years old, and the owner of four good delta plantations, named "Good Hope," on which he had resided, with appellant, his wife, for thirty years; "Mileston," "Quofoloma," and "Omega." The latter two lay west of Good Hope, which separated them from

Mileston.   By a former marriage Gen. Miles had two sons—
Theus N. Miles, who had a wife and three children; and Ed-
ward H. Miles, a bachelor; all of whom lived in Louisiana, and
were then visiting Gen. Miles.   During their visit a present
gift of all the sons were ever to receive from their father's es-
tate was discussed and settled.   Before that visit Theus N.
Miles, by an extensive correspondence, had tried to purchase
from Edward H. Miles whatever property his father should
allot to him.   After full discussion, Gen. Miles intended to
give Omega to Edward H. Miles and Quofoloma to appellees,
Theus N. Miles and his wife, for life, with remainder to their
children.   Thereupon, in consideration of $10,000 in notes of
Theus N. Miles, secured by a vendor's lien, Edward H. Miles
executed to appellees a deed to all his interest in his father's
estate, not specifying its nature, after which Gen. Miles exe-
cuted a deed to appellees to certain lands, not including any of
section 33, declared to constitute the Omega and Quofoloma
plantations—the deed in controversy—its preamble reciting
that Theus N. Miles had purchased the interest of Edward H.
Miles.   The deed declared it was all that either would receive,
and based the consideration on love and affection.   On Decem-
ber 6, 1875, Gen. Miles executed a deed to Theus N. Miles to
a half interest in lands—the other half interest being then sold
for $30,000—in which deed, signed by both, were recitals that
Theus N. Miles had previously received $18,000 as advance-
ments, and was to have nothing more from his father's estate
than the land then conveyed.   Gen. Miles, after having been
financially involved for a long time, in February, 1895, with
$25,000 borrowed from appellant, Mary R. Miles, proceeds of
her mother's estate, discharged the last incumbrance on his
property.   In consideration of the $25,000, he then signed, ac-
knowledged, and delivered to appellant, Mary R. Miles, a deed
to the Quofoloma plantation, which she retained, but did not
file for record.   On July 7, 1897, Gen. Miles made his last

will, devising to appellant, Mary R. Miles, all property he had reserved, including Good Hope plantation, consisting of lands embracing all of section 33. He died January 1, 1900. After his death, Theus N. Miles having paid none of the purchase-money notes, amounting to $10,000, Edward H. Miles instituted suit in the chancery court of Holmes county to enforce his vendor's lien notes against appellees and the Quofoloma plantation, alleging that Gen. Miles had determined to deed him Omega, which was the share of Gen. Miles' estate intended to be described in the deed to appellees from Edward H. Miles, and for which the notes were given, and that for the Omega plantation, afterwards, on account of this deed, conveyed by Gen. Miles to appellees, Edward H. Miles was the vendor, and Gen. Miles the grantor. A demurrer to this bill was sustained in the chancery court upon the ground that the deed was a nullity. This decree was reversed by the supreme court. Reported, *Miles* v. *Miles*, 78 Miss., 904 (30 South., 2). After this reversal the case was tried, the bill sustained, and decree entered against Omega for the purchase money. These proceedings were in evidence in this case.

In 1900 appellant, Mary R. Miles, leased the Good Hope plantation to one Thompson, who instituted an action of ejectment against appellees for the 110 acres of section 33 within the Horseshoe. Appellees instituted this suit to reform their deed of July 1st, and to enjoin appellant and all others from claiming that land under the last will of Gen. Miles. The bill alleged that the plantations were always known, managed, and dealt with by plantation names, and were so platted on Gen. Miles' plantation map; that Gen. Miles and Theus N. Miles believed until the survey was made in December, 1899, that the west boundary line of section 33 ran east of the land within the Horseshoe, and all of that land to be in section 32, and that, while he did intend to reserve section 33, they did not know any part of it was within the Horseshoe, and that the deed

sought to be reformed and the will were all parts of one transaction, by which two plantations were to go to his sons—Quofoloma and Omega—and the other two were to be retained by Gen. Miles, and devised to appellant, Mary R. Miles, as was done. Appellant, Mary R. Miles, in her answer, denied that any part of section 33 ever constituted any part of Quofoloma; that the plantations were well known by boundaries, always operated or disposed of, or were ever so platted; alleging the boundaries were indefinite, often changed; and that, in all of the numerous conveyances and incumbrances of Quofoloma by Gen. Miles, it had never been given the same boundaries or contents twice alike, and never embracing any part of section 33, all of which section had always been included in the descriptions of Good Hope plantation, taxes having always been paid upon the whole of it as part of Good Hope, to the present time; alleging further that Gen. Miles had intended Omega for Edward H. Miles, who intended that plantation as the property conveyed by him to appellees; that, on account of this deed, Gen. Miles conveyed it with Quofoloma, originally intended for appellees; that appellant had advanced $25,000 in February, 1895, to Gen. Miles, and received and held an unrecorded deed to Quofoloma; and that prior to 1897 Theus N. Miles had received all of his father's estate ever intended for him, and so acknowledged in a recorded deed executed in December, 1895. Appellees introduced several negroes who had long lived on the plantation, and three white men who had formerly been managers, to show that the land in the Horseshoe was treated and considered a part of Quofoloma. To the same effect several white men as well as Theus N. and Edward H. Miles testified. The managers stated that for many years the manager of Quofoloma would manage a part of Good Hope or Omega. A surveyor testified that the section line between sections 31 and 32 across Horseshoe had never been run until December, 1899, though it appeared upon the county map, and the plantation map of General Miles, which he often consulted,

showed that about 110 acres of cleared land in section 33 were within the Horseshoe, which was an impassable brake, about a quarter of a mile wide, in section 33.   The entrance to the land in the Horseshoe was on the west side, partly on section 29, which belonged to Omega, and partly on section 32, belonging to Quofoloma.   Theus N. Miles admitted in his deposition that at the time of the execution of the deed, both he and General Miles knew that a part of the land in section 33 was within the curvature of the Horseshoe, but that General Miles declined to put any of section 33 in the deed, stating that only about ten acres was within the Horseshoe, and that appellees would not be troubled.   On behalf of appellant it was proven by deeds and deeds of trust that, from before the civil war until now, every conveyance and incumbrance of Good Hope had all of section 33, and that no conveyance or incumbrance of Quofoloma (and a number of them were introduced) ever included any part of section 33.   General Miles' map, put in evidence, showed that there were no boundaries fixed between his different plantations, and nothing showing what constituted each, other than marginal notations giving the quantity of cleared land of each, and that the cleared land accorded to Quofoloma was fully made up from that contained in the sectional numbers embraced in the deed in controversy, and that, without the 110 acres of cleared land within the curvature of the Horseshoe, the cleared lands assigned to Good Hope could not be made up, being short to that extent.   It was also proved that not until surveys made after General Miles' death were the boundaries between Good Hope, Quofoloma, and Omega, north and south of Horseshoe, known, and that lands were worked until this survey, by appellant deeded to appellees, and by appellees that were devised to appellant.   It was shown that the lands within the Horseshoe had nearly all been cleared by a tenant who lived in the Horseshoe, and to whom the lands were leased for fifteen years by the name of the "Horseshoe Tract."   By negroes who had lived on the

places, and by a physician who lived on adjoining land, and who had practiced on the plantation since before the civil war, it was proved that there were no generally known lines between the plantations, and that they had regarded the lands within the Horseshoe as a separate tract. No witness on either side could give the boundaries of any plantation. Appellant, Mary R. Miles, testified that General Miles knew he had reserved from the deed to appellees a part of the land within the Horseshoe, and so stated to Theus N. Miles in her presence, at her table, about the time appellees went into possession of the land in controversy, and that General Miles knew only approximately where the lines between the plantations ran; that some hands on each plantation worked some land on the other plantations; and that pending a survey each worked some of the lands owned by the other. Theus N. Miles did not deny the conversation, and testified that no improvements were put by him on the land in controversy, but extensive improvements were put on the other property, and that after the survey of December, 1899, General Miles told him he would convey him the land within the curvature of the Horseshoe in section 33, but died shortly afterwards. Witnesses testified to General Miles claiming the land within the Horseshoe after the deed to appellees; and a priest, nephew of General Miles, whom General Miles had educated, testified that he was present when the deeds were discussed and drawn, and that the plantation maps were consulted then, and deeds drawn with reference to them. These facts and his presence were denied by Theus N. and Edward H. Miles. All the evidence of Theus N. Miles was objected to as being incompetent under the statutes prohibiting parties from testifying to establish their own claims against the estates of decedents, and was in part excluded.

*Noel, Pepper & Elmore,* for appellants.

If the plantation names are to be accepted as the boundaries, then the records furnish a constantly varying description, and

no living man could be found who could locate by any writing the plantation of Quofoloma, as it is set forth in the bill.

The mistake alleged consisted in this: General Miles did not intend to embrace any of section 33 in the deed sought to be reformed, and intended all of it for Mrs. Miles, but did intend to convey Quofoloma, which was thought to embrace all of Horseshoe. If the deed be reformed, Mrs. Miles will be deprived of 110 acres of the best land in Good Hope plantation and section 33, all of which was intended and all of which was embraced in every description of Good Hope appearing in any writings ever made by General Miles, giving the land composing that plantation, and no part of which was ever embraced in any section of land called Quofoloma, or in any conveyance embracing any part of Quofoloma land.

The principle which lies at the foundation of all suits to reform is this, that the court cannot make such a contract as the parties ought to have made, or would have made, if better informed, but merely makes it what the parties intended it should be. *Williams* v. *Hamilton,* 65 Am. Rep., 482; *St. Anthony Falls Co.* v. *Merriman,* 33 Minn., 42.

The intention meant, in saying that equity will perform a written agreement so as to express and carry out the intention of the parties, is the intention of both parties to something upon which their minds actually met. *Williams* v. *Hamilton,* 65 Am. Rep., 484.

Had the agreement been made to convey lot 4, and had there been merely a mutual mistake as to its boundaries, this would have constituted no grounds for reformation of the deed. *Crookston Imp. Co.* v. *Marshall,* 47 Am. St. Rep., 614.

Equity will not reform a contract to make it express what the parties but for a misapprehension would have intended. The real question is, What did the parties intend at the time, informed as they were? *Wise* v. *Brooks,* 69 Miss., 891.

"In order that a mistake made may come within the cogni-

zance of a court of equity, it must be shown to be: Material, or the moving cause of the complaining parties; and mutual, or shared by both parties to the transaction; and unintentional; and free from negligence; and complainant must have an equity superior to him against whom he seeks relief." 15 Am. & Eng. Ency. Law (1st ed.), 628; 20 Am. & Eng. Ency. Law, 826.

Courts of equity do not grant the high remedy of reformation upon probability, or even upon preponderance of evidence, but only upon a certainty of the error. Pomeroy's Eq. Jur., sec. 856; *Crofton* v. *B. & L. Assn.*, 77 Miss., 166; *Wilczinski* v. *L., N. O. & T. R. R.*, 66 Miss., 595; 20 Am. & Eng. Ency. Law, 813, 821.

"It is an elementary rule of equity jurisprudence that a court of chancery will assist only the vigilant. Hence, it will not relieve against the results of an essential error when, by the use of ordinary diligence, the party affected could have had a knowledge of the truth, or against an error of expression which occurred through complainant's negligence in the framing of the instrument, or through mutual carelessness in procuring a description of the land conveyed. . . . .

"Nor does the circumstance that both were equally mistaken concerning the fact, affect the transaction, if the mistake was one which either, by the exercise of ordinary diligence, might have discovered. Where the circumstances put both on inquiry neither can be heard to complain of a result of which his own want of vigilance was the proximate cause." 20 Am. & Eng. Ency. Law (2d ed.), 831.

The bill itself shows that there was no consideration, valuable, for the deed sought to be reformed. The attempt to make one, by evidence, failed utterly.

"If there be no consideration, or if the only consideration be a moral duty or natural affection, which are termed good, but not valuable consideration, the court of chancery will not interfere." Adams Equity, 78.

"It is a fundamental principle that equity will not decree the specific execution of a contract unless the undertaking to be enforced is founded upon valuable consideration, moving from the party in whose behalf the performance is sought; in other words, the remedy cannot be obtained for a merely voluntary agreement." Pomeroy on Contracts, sec. 54.

"Where a contract is entirely voluntary or without consideration, or is in effect and substance a mere gift, it will not be specifically enforced, for equity will not compel a party to be generous." *Shackelford* v. *Hanley,* 10 Am. Dec., 302.

The will of General Miles is made an exhibit in the bill. Section 33 is mentioned in that will, is given and bequeathed to Mrs. Miles, and is not mentioned in the deed to appellees. They seek to put it in the deed, and to debar, by injunction, Mrs. Miles from setting up any claim to the will. This is in effect a reformation by indirection. It is an old and well-established principle of law that what cannot be done directly, cannot be done indirectly. Mistakes in wills to describe property intended to be devised cannot be corrected by reformation. *Ehrman* v. *Hoskins,* 67 Miss., 192; *Schlottman* v. *Hoffman,* 73 Miss., 188; *Johnson* v. *Delome,* 77 Miss., 15; 15 Am. & Eng. Ency. Law (1st ed.), 663.

"Where there is both a particular description by metes and bounds, or by courses and distances, and a general descriptive designation, the latter, as a rule, yields to the former." 5 Cyc. Law & Pr., 880.

"While no inflexible rule can be laid down with regard to the relative weight to be given to the conflicting element of a description of boundaries, it may be stated generally that when all the calls of an entry, survey, deed or grant cannot be complied with because some are vague or repugnant, such vague or repugnant calls may be rejected or controlled by other consistent and certain material calls." 5 Cyc. Law & Pr., 912.

"A particular description prevails over and limits the appli-

cation of a general description in whatever order they may come." Tiedman on Real Estate, 827, 828.

*C. H. Williams,* and *Tackett & Smith,* for appellees.

It was the intention of all the parties to this transaction, which was the consummation of a family settlement, that this deed from W. R. Miles to Theus N. Miles should convey "Quofoloma" plantation, and this land in controversy was omitted by mutual mistake from the particular description thereof. Supporting this we show: That the issue as to the intention to convey "Quofoloma" plantation is not raised by the pleadings, and the defense there seems to be that this land is not a part of "Quofoloma," but is a part of "Good Hope" plantation. The deed on its face expresses the intention to convey Quofoloma plantation. The will under which Mrs. Miles claims title states in so many words that by this deed he had conveyed Omega and Quofoloma plantations to Theus Miles. In July, 1897, either just after or just before this family settlement, General Miles told Capt. C. J. DuBuisson that he had given, or intended to give, his Omega and Quofoloma plantations to his son Theus. Kellogg, a witness for defendant, states that General Miles told him he intended to convey to Theus the Omega and Quofoloma plantations, and that the General told him this on many occasions. The intention to convey Quofoloma plantation by this deed is further proven by the grantees at once taking possession of the entire Quofoloma plantation, and of the land in controversy as a part thereof, and holding possession, ditching, clearing, leasing, collecting rents, and exercising all acts of ownership with the full knowledge of General Miles and without challenge of their right by him. Not until after his death was this right disputed, and it would not have been disputed then if Theus Miles himself had not discovered and made known the error in the description, so thoroughly was it known that this land was a part of Quofoloma plantation.

This land in controversy is and always has been a part of Quofoloma plantation, and General Miles so recognized it during his life. In support of this, General Miles, in this family settlement and in all instruments relating to it, divides his entire real estate into four parts, each part designated by its plantation name of Omega, Quofoloma, Good Hope, and Black Bayou. By the will and this deed he makes a complete disposition of all of his real estate by devising two plantations—Good Hope and Black Bayou—to Mrs. Miles, and conveying two— Quofoloma and Omega—to Theus by this deed. When he delivered possession under this deed to Theus, he delivered possession of the two plantations—Omega and Quofoloma—and as part of the latter delivered possession of all the land in controversy. The very topography and shape of the land in controversy leads one to the natural conclusion that it is a part of Quofoloma, and could not have been a part of Good Hope. The word "Quofoloma" is an Indian word, generally said to mean "horse's hoof," and the name was undoubtedly given the plantation because of its shape, and for the same reason this particular part of the plantation from the heel to the toe was popularly called "Horseshoe Island," and the body of water surrounding it, "Horseshoe Lake," or Bayou. The map attached hereto shows that the land in controversy is at the toe of this horseshoe, entirely cut off from the balance of section 33 and from every other plantation or body of land, except Quofoloma.

Every one who ever bought or leased Quofoloma plantation, buying and leasing by plantation names, has gone into possession of this land in controversy as a part of said plantation, but Mrs. Miles now claims it in spite of this and in spite of the fact that her dead husband was more than generous to her in the disposition of his property, having given her, practically, twice as much as both sons together. No lessee of Good Hope ever did take possession of this land.

The right of a court of equity to reform a deed on account of

mutual mistake is unquestioned and hardly needs citation of authorities to support it.    Almost all written instruments may be reformed.    The following are among the most important: deeds, mortgages, leases, bonds, and marriage and family settlements.    3 Pomeroy Eq. Jur. (2d ed.), sec. 1376; 18 Ency. Pl. & Pr., 801; 2 Pomeroy Eq. Jur. (2d ed.), sec. 852.

As to the proof necessary to warrant this relief, our own court says that the test of the sufficiency of evidence warranting the reformation of an instrument is simply its capacity to satisfy the mind of the court.    *Phoenix Fire Ins. Co.* v. *Hoffheimer,* 46 Miss., 645.

A deed may be reformed where the parties understand the meaning of the language used in the description and believed it corresponded with the actual boundaries of the land intended to be conveyed, but were mistaken therein.    15 Am. & Eng. Ency. Law (1st ed.), 656, note; *May* v. *Adams,* 58 Vt., 74; *Johnson* v. *Tabor,* 10 N. Y., 319; *Bush* v. *Hicks,* 60 N. Y., 298; *Crookston Imp. Co.* v. *Marshall,* 47 Am. St. Rep., 613; *DeRiemer* v. *DeCantillion,* 4 Johns. Chan. (N. Y.), 83.

The fact that the defect or mistake is of such a character that it may be aided by parol evidence and made a defense in a suit at law does not take away the jurisdiction of a court of equity to reform the instrument.    *Cummings* v. *Steele,* 54 Miss., 647; *Green* v. *Dickson,* 72 Am. St. Rep., 920.

These deeds and the will are all one instrument; the result of a family council.    These instruments all refer to one another; are parts of one and the same transaction; executed in pursuance of the same common purpose, and are so closely connected, the one with the other, as to constitute one deed of partition, as it were.    This inseparable connection is more clearly shown by the will.    *Cummings* v. *Freer,* 26 Mich., 135; *Tollett* v. *Tollett,* 1 W. & T. Lead. Cases (H. & W.), 189; Bispham's Equity, sec. 194; Fonblank's Equity, 340, note B;

*Dennison* v. *Goering,* 7 Pa. St. Rep., 175; *Powell* v. *Monsey,* 98 N. C., 426 (s. c., 2 Am. St. Rep., 343).

Argued orally by *E. F. Noel,* for appellants, and by *S. M. Smith,* for appellees.

TRULY, J., delivered the opinion of the court.

Two questions of law are presented by this record: First, whether the instrument in question is properly subject to reformation under the facts found by the chancellor to be true; second, do the appellees occupy such a position that a court of equity will intervene in their behalf?

The power of a court of equity to compel reformation of deeds, and make them conform to the real intention of the parties, in cases where mutual mistake of fact has occurred, is so firmly established as to scarce demand citation of authority. It is elementary that the province of a court of equity is to see that the real wishes of contracting parties should not be frustrated by mistakes innocently and mutually committed. 2 Pom. Eq. Jurisprudence, secs. 852–870; *Ins. Company* v. *Hoffheimer,* 46 Miss., 645; *Simmons* v. *North,* 3 Smed. & M., 71; 18 Ency. Pl. & Pr., p. 774, note 1. "An ancient and unquestionable jurisdiction of a court of equity is to grant relief on account of a mistake of facts in written contracts, whether executed or executory, if the writing expresses something of substance variant from what the parties actually intended." *Dunbar* v. *Newman,* 46 Miss., 234. A court of equity will entertain a suit for the reformation of a deed when there is a material mistake in the description of lands intended to be conveyed, so that more or less or different property is included than the parties in fact intended, and the inaccuracy of the description will be corrected. 18 Ency. Pl. & Pr., p. 780; *Gwyer* v. *Spaulding,* 33 Neb., 573 (50 N. W., 681); *Improvement Company* v. *Marshall,* 57 Minn., 333 (59 N. W., 294; 47 Am. St. Rep., 612); *DeRiemer* v. *DeCantillon,* 4 Johns. Ch., 88; *May* v. *Adams,* 58

Vt., 74 (3 Atl., 187). And a court of equity will likewise inter-
pose and correct a mistake of fact, even though the parties
employ the very terms they designed to use.    The rule is not
different where there is a mistake in the omission or insertion
of words contrary to the intention of the parties, and when they,
understanding the language used in the description, believe it
to correspond with the actual boundaries of the lands intended
to be conveyed and are mistaken.    So decided in *Bush* v. *Hicks,*
60 N. Y., 302, where the court further says: "The counsel is
mistaken in supposing that the deed can be reformed only in
cases where the mistake consists in the omission or insertion of
words or clauses contrary to the intention of the parties.    Al-
though the parties understood what language was contained in
the deed, if they believed the description corresponded with the
actual boundaries of the land intended to be conveyed, and were
mistaken, the cause for reformation was made out."    Viewing
the facts developed by this record in the light of the principles
of law above announced, we entertain no doubt that it was
within the province of a court of equity to order a reformation
of the deed from William R. Miles to appellees, so that the same
could, in truth, express the real intention of the parties.    It
may well be true that both parties employed the descriptive
terms used in that instrument advisedly and intentionally, and
yet, if this was under the mistaken impression that all of the
land in the Horseshoe was included in the description, the court
properly ordered the reformation, so that the deed might convey
what the parties intended it should convey.    The chancellor
decided that it was the intention of William R. Miles that
appellee should have all of Quofoloma plantation, and it is
scarce open to the suggestion of a doubt that the land in the
Horseshoe was considered and treated by all parties as a portion
of that plantation.    The fact that appellees entered into pos-
session of the land in controversy under the deed in question,
that this possession was recognized and acquiesced in by the

grantor, and that possession of this tract had always passed as a portion of Quofoloma, when considered in connection with the geographical location of the tract, surrounded on three sides by other lands acknowledged to belong to Quofoloma, and separated from the other plantations by impassable barriers, demonstrates with practical certainty that the land in controversy was intended by all parties to pass under the plantation name, "Quofoloma." When two descriptions are employed in a deed, the court will adopt that one "which, in the light of surrounding circumstances, can be said to effectuate most clearly the intention of the parties." Devlin on Deeds, sec. 1038; *Rutherford v. Tracy,* 48 Mo., 325 (8 Am. Rep., 104); *O'Herrin v. Brooks,* 67 Miss., 266 (6 South., 844); 2 Pom. Eq. Juris., sec. 871. To hold that a court of equity could not interpose to correct mistakes for the reason alone that the parties used the terms they actually intended to use would be to curtail its powers to a hitherto unheard of extent. Most mistakes of fact in conveyancing, except those caused by clerical misprision, arise in cases when descriptive terms are intentionally employed under the mistaken impression that they apply to the property sought to be conveyed.

It is, however, contended by appellants that, though ordinarily a court of equity might authorize a reformation, in the instant case appellees have no standing in court to warrant this interposition in their favor. And in support of this contention, appellants rely upon the principle that equity will not interpose to order a reformation of a deed in favor of a volunteer. This principle has no application to the case at bar. Appellees are not volunteers. A part of the consideration of the conveyance from William R. Miles to them was the purchase by Theus N. Miles of his brother's interest in the estate of William R. Miles for the sum of $10,000. This purchase enabled William R. Miles and Edward H. Miles to each carry out his own personal wishes in reference to the interest of Edward H. in his father's

estate, and this is sufficient to prevent the operation of the rule against volunteers being invoked against appellees. But a second and stronger reason is that the instrument by which Quofoloma and Omega plantations were vested in appellees, and that by which Mileston and Good Hope plantations were vested in appellant Mary R. Miles, constitute, in fact, one and the same transaction. All parties deraign from a common source, and stand before the court in the same attitude as if they had inherited the property jointly, and then undertaken to amicably divide the same, and a mutual mistake had occurred in their deeds of partition. In *Miles* v. *Miles,* 78 Miss., 904 (30 South., 2), where the identical instruments now under review were considered, it was held that they formed parts of one and the same transaction, and evidenced a family settlement then consummated by William R. Miles, by which all of his property was divided among his heirs. The power of a court of equity to reform instruments and correct mistakes growing out of such transactions in proper cases is universally recognized. Pom. Eq. Juris., sec. 877; 3 Pom. Eq. Juris., sec. 1376. The well-settled rule that equity will not interfere in favor of a volunteer against a grantor to correct a mistake or reform a defective conveyance is based upon the idea that the volunteer is but the recipient of a bounty, and has no enforceable claim or demand. This is sound law, but not applicable to the case here presented. Here the grantor's interests are not involved. This is not a contest between a prior and subsequent voluntary grantee, for appellants and appellees claim from the same source, and derive title by virtue of the same transaction. The disputed question is as to the real intent of the common grantor. This being ascertained, a court of equity will decree that it be enforced. Such cases do not fall within the rule denying the aid of equity to voluntary grantees. *Adair* v. *McDonald,* 42 Ga., 506; *Huss* v. *Morris,* 63 Pa., 372; 18 Ency. Pl. & Pr., p. 787. In *Cummings* v. *Freer,* 26 Mich., 130—a case strikingly in point—

where the father had undertaken to divide his estate in his lifetime, and after his death suit was brought to reform one of the conveyances, Christiancy, C. J., says: "Independent of the agreement, the transaction in reference to the deed, as set forth in the bill, was this: The grantor undertook to convey to his four sons, respectively, the whole of his lands, by conveying separate parcels of them to each, though, in our view, it makes little difference whether he owned other lands or not. It is entirely unimportant whether any consideration was paid to the father or not. The father was dividing his lands upon this section among his four sons, and the case, as presented by the bill, stands upon substantially the same principle as if these four sons had inherited or otherwise owned the whole of the lands in common, in proportion to the value of the interests undertaken to be conveyed to each, and they had undertaken to make an amicable partition of the lands by conveying to each his respective portion, and the same mistake had been made; the portion received by each being a consideration for his conveyance to the other." And after referring to the general principle that equity will not assist a grantee in a voluntary deed, he continues: "But after such a deed has been executed and delivered, and the grantee, on the faith of it, has gone into possession, made improvements, and expended money upon it, I see no reason to doubt his right to sustain a bill against the grantor or his heirs for the correction of a mistake in the deed, if he can show the mistake, and the land clearly intended to have been embraced." The case at bar presents even stronger reasons why the rule against volunteers cannot be invoked against appellees. They not only entered into possession of the land under the deed, with the knowledge of the grantor, and made improvements and expended money, but, as a part of the consideration of the deed from William R. Miles, Theus N. Miles, one of the appellees, obligated himself to pay his brother a large sum of money for his interest in the estate of William R.

Miles, including the land in controversy.   An inspection of the deeds and the will, component parts of the transaction by which the family settlement was arranged and perfected according to the plan and desires of William R. Miles, makes it perfectly manifest that this purchase by Theus R. Miles formed a part of the consideration moving William R. Miles to divide his property among his heirs in the manner selected.

For the reasons indicated, we are of the opinion that the appellees were entitled to invoke the aid of a court of equity to reform the deed so that the real intention of the parties could be effectuated, and, accepting the finding of the chancellor upon disputed questions of fact as conclusive, we find no grounds for disturbing the decree.   If error, the rulings of the chancellor on the admission of testimony could not affect the result.

*The decree is affirmed.*