¶ 1. Two brothers were involved in litigation to define a boundary description that they had used a few years earlier when they divided their commonly owned tract in two. During the progress of the suit, the parties agreed as to the location of an obscure road that had been set out in the deeds as the dividing line. That created two unequal sized tracts. One of the parties continued to argue that the intent of the brothers had been to divide the land equally. The chancellor found that since the ambiguity in the deed description had been resolved by agreement, there was no longer justification for reformation. We find no error on this record and these pleadings, and affirm.
¶ 2. This suit began as a complaint to remove clouds from title and establish a boundary line. Wayne DeLoach and his wife were the plaintiffs, while Charles L. DeLoach was the only named defendant. Charles DeLoach has since died and his heirs have been substituted in the litigation. The land at issue is about half of the 800-acre tract conveyed to members of the DeLoach family in 1949. Whether it should be exactly half is the central issue before us. Sidney W. DeLoach was the father of the original parties in this suit. He became the owner of all 800 acres in November 1962. On the same day, he used the following description to convey part of the land to his two sons: *Page 148 
 The N ½ of the following described land and being that part of said land lying north of a gravel road running over an old abandoned railroad dummy line and running east and west through the entire tract of land:
 Lot 16 in Section 23; Lots 8 and 14 in Section 24; Lots 1, 2, 4, 5, 6, 7, 8, 9, and 10 in section 25; Lots 2, 4, 10 and 11 in Section 26, all in Township 22 North, Range 1 East, 800 acres more or less, Tallahatchie County, Mississippi.
¶ 3. Based on what is in the record, this 1962 deed was the first to refer to an old railroad line or gravel road as lying within the 800 acre tract. In 1966, Sidney W. DeLoach conveyed to all four of his children the remainder of the 800 acres. This time, he even more explicitly stated that the conveyance was of one half of the total tract. The description was identical to the one used in 1962, except it twice substituted "south" for "north" in the initial phrase. After the description concluded, this language appeared: "Intending to describe and convey the S ½ of said tract or 400 acres more or less lying south of said gravel road." That kind of intent statement does not appear in later deeds.
¶ 4. Various subsequent conveyances were made within the family using these same descriptions. In 1994, the 800 acres became owned just by the two brothers, Wayne and Charles DeLoach, as tenants in common. That same year, the brothers divided the land in two. The deeds used these mirror descriptions: "The South ½ [or the North ½] of the following described land and being that part of said land lying South [or North] of a gravel road running over an old abandoned railroad dummy line and running East and West through the entire tract of land"; each deed then described the total 800 acres by proper description.
¶ 5. Not long after the brothers executed the 1994 deeds to each other, a dispute arose about the location of the boundary dividing their two tracts. Wayne DeLoach filed suit claiming that the boundary was an old railroad dummy line that a surveyor allegedly could identify.[1]
Charles DeLoach answered contending that the boundary line was a gravel road.
¶ 6. A hearing was held in September 2000. Surveyors were called by each side to testify as to the location of the railroad dummy line and gravel road. Wayne DeLoach's surveyor testified that the present gravel road appeared to be about in the same location as a road that appeared on U.S. Geological Survey maps from the 1930's. This surveyor also found pilings remaining from an old bridge over a creek. "If that's the railroad bridge," the surveyor stated, then the old railroad lined up at the creek with the present road. No evidence of a railroad dummy line was found anywhere else along the road. It has been Wayne DeLoach's position throughout the litigation that the boundary used in the deed was clear and ascertainable.
¶ 7. The surveyor for the Charles DeLoach heirs had no opinion on whether the *Page 149 
present gravel road was the same road that was built over an old railroad line. These DeLoaches claim that the boundary used in the deed referred to no currently verifiable location.
¶ 8. Neither surveyor gave an answer initially satisfactory to the chancellor that the present road on the property was the road referenced in the deed description, especially because there was almost no evidence of the old railroad line on top of which the road was supposed to run. At the first hearing, the chancellor stated that when a deed purporting to describe half of a tract of land uses unclear landmarks, perhaps the proper approach was to survey the entirety and divide the land precisely in two equal portions. Considering each side's evidence, the judge was not confident that he could make a decision. Responding to these concerns, the parties indicated that they might be able to resolve some of the confusion. The September 2000 hearing was continued for ten days.
¶ 9. We have no record of a hearing a few days later. A motion was filed in January 2001, stating that "no progress had been made concerning the solution to the problem." The next transcribed hearing was in October 2001. Both attorneys informed the court that the boundary line that was referenced in the deed should be deemed to be the road as it appeared on the plat prepared by the surveyor who had been employed by the Charles DeLoach heirs. The ambiguity in the deed description was resolved with the adoption of an identified road's current location.
¶ 10. The Charles DeLoach heirs still contended that it was the intent of the brothers in 1994 to divide the land into two exact halves. Using the present gravel road as the boundary made the southern tract larger by 65-80 acres. At the conclusion of the second hearing, and after the parties had agreed to deem the gravel road to be the boundary referenced in the deed descriptions, the chancellor asked for briefing on the effect of the deed reference to "half" of the 800 acre tract:
 North half, south half. So, what does that mean? Is 40 or 50 acres inconsequential or is it substantial? What if it said the north half and it only gave you 10 acres and the other party 790 acres? Would that make any sense? Would that be a problem? I don't know. . . . So let's get some law. There probably is some law on that we need to take a look at, and I need to see whether we need to go forward with some sort of contention of reformation or not. But I need to see the law first.
¶ 11. In February 2002, the chancellor ruled that since the boundary referenced in the deed had been agreed to be the gravel road, no defect in the description any longer existed. Extrinsic evidence of intent was relevant only if the description was vague. Since there was no ambiguity, there could be no reformation. This appeal has followed.
 DISCUSSION
¶ 12. On appeal, the Charles DeLoach heirs seek judicial reformation of the 1994 deed. Generally, an instrument that is unambiguous will not be reformed absent proof of mistake, fraud, or duress. See Pursue EnergyCorp. v. Perkins, 558 So.2d 349, 352 (Miss. 1990). This deed had been ambiguous — indeed, the railroad dummy line's location remains at best a guess. However, the parties in this litigation created a meaning for that description. There never was a written stipulation setting out the terms of the agreement. After one attorney explained what the parties had agreed, the chancellor summarized the agreement as being that the location of a gravel road as *Page 150 
shown on a survey "will stand as the dividing line of the road mentioned in the deed, as it is today and will be the division line between the property, as set forth in the deed itself and as described in the deed. . . ." Both attorneys agreed with this characterization of the stipulation.
¶ 13. What was not stipulated was that this surveyed road was the dividing line intended by the brothers when they executed their deeds to each other in 1994. The location of the old road and railroad line may not have been known nor even considered by the brothers. Instead their father's 1962 description may have been somewhat carelessly utilized in 1994. The courtroom agreement effectively rewrote the ambiguous deed such that it now had a definite, post-execution meaning, but not stipulated was the 1994 intent of the deed. The Charles DeLoach heirs have all along argued that when the two brothers acquired equal one-half interests in the property, then by quitclaim deeds divided the land in two, their intention was that each would own an equal-sized tract. That is certainly a reasonable conclusion. When the hearing ended in October 2001, though, parol evidence of the intent of the parties had not been introduced. The chancellor later ruled that absent ambiguity in the description, no evidence could be introduced to demonstrate that the land was intended to be divided into two precisely equal halves. Whether that is correct is our issue on appeal.
¶ 14. When reformation of a deed is permitted, it is for the purpose of removing ambiguity or correcting error arising from mistake, fraud or duress. As to ambiguity, the rule is this:
 When the language of the deed or contract is clear, definite, explicit, harmonious in all its provisions, and free from ambiguity throughout, the court looks solely to the language used in the instrument itself, and will give effect to each and all its parts as written. When, however, the language falls short of the qualities above mentioned and resort must be had to extrinsic aid, the court will look to the subject matter embraced therein, to the particular situation of the parties who made the instrument, and to the general situation touching the subject matter, that is to say, to all the conditions surrounding the parties at the time of the execution of the instrument, and to, what as may be fairly assumed, they had in contemplation in respect to all such said surrounding conditions, giving weight also to the future developments therein about which were reasonably to be anticipated or expected by them; and when the parties have for some time proceeded with or under the deed or contract, a large measure, and sometimes a controlling measure, of regard will be given to the practical construction which the parties themselves have given it, this is on the common sense proposition that actions generally speak even louder than words.
Royer Homes of Mississippi, Inc. v. Chandeleur Homes, Inc., 857 So.2d 748, 754-55 (Miss. 2003), quoting Farragut v. Massey, 612 So.2d 325, 329 (Miss. 1992), which quoted Sumter Lumber Co. v. Skipper, 183 Miss. 595, 608-09, 184 So. 296, 298-99 (1938).
¶ 15. As to mutual mistake by the parties to a deed, this explains the obligation of the court:
 One of the assignments argued by the appellants is that the court erred in admitting parol evidence to show the intention of the parties to the deed as the deed was plain and unambiguous. The appellant cites numerous authorities to support his contention, however, these cases are not applicable in reformation proceedings. *Page 151 
 "It is practically a universal rule that in suits to reform written instruments on the ground of fraud or mutual mistake, parol evidence is admissible to establish the fact of fraud or of a mistake and in what it consisted, and to show how the writing should be corrected in order to conform to the agreement or intention which the parties actually made or had. . . ."
Bedford v. Kravis, 622 So.2d 291, 294 (Miss. 1993), quoting Smalley v.Rogers, 232 Miss. 705, 710-11, 100 So.2d 118, 119-20 (1958), which quoted 45 Am.Jur., Reformation of Instruments, § 113 (1943). An ambiguous deed can be reformed. So may an unambiguous deed in situations in which because of mutual mistake or fraud the description used did not reflect the intent of the parties.
¶ 16. We have been discussing general legal principles. Preliminary to applying them here is another general legal principle — an issue cannot be raised for the first time on appeal. We must be able to find that the issue of reformation was presented to the chancellor for resolution. The chancellor cannot be found to have erred by failing to answer a question never posed.
¶ 17. The Charles DeLoach heirs clearly pled that the gravel road that lay on top of an old railroad dummy line could not be reliably located, and therefore an equal division of the property into north and south halves should be made. The initial answer alleged that the location of the relevant road was not discernible. Then, in January 2001, Charles DeLoach filed this request of the court:
 appoint the two surveyors to work jointly together for the Court to equitably divide the property and to prepare for the Court's adoption a proper and fitting legal description, said description and division to equitably divide all of the property in question, by acreage and by value of said property and the improvements thereon, and to submit this proposal to the Court and to the parties for consideration and adoption.
¶ 18. In April 2001, in their answer to an amended complaint, the Charles DeLoach heirs continued to assert the ambiguity in the deed and the consequent need for an equitable division. In July 2001, in a cross-complaint, the Charles DeLoach heirs pled that the land described had never been surveyed, and that the parties' two surveyors had been unable to locate the center line. The heirs alleged that the deed "description is vague and of such a nature as to render it impossible to determine exactly what was contemplated by each of the parties at the time that the deeds were executed." The prayer for relief was that a survey of the entire 800 acres be performed and that two "equitably divided" portions be made. This pleading alleges ambiguity and impossibility of locating the boundary.
¶ 19. This reveals that throughout the litigation prior to the October 2001 hearing, Charles DeLoach and then his heirs had relied totally on ambiguity as the basis for reformation. Then, at the October 2001 hearing, both sides agreed to consider a gravel road located by both surveyors during the litigation as the boundary for purposes of the deed. The question now is whether ambiguity as a basis for reformation was thereby eliminated. There was still pleading support for an equal division based on ambiguity, but was the issue waived by the stipulation? It is as if a deed between brothers referred to a completely unknowable point of beginning, for example, a landmark known only to their father as "Rosebud" and to which he had referred in another, decades-earlier deed. The parties to the deed during litigation agree to make the unknowable knowable *Page 152 
by deeming a certain tree as the one that would be considered to be Rosebud. No intent contemporaneous to their own deed existed as to such a designation.
¶ 20. Whether such facts mean that there is no longer ambiguity as a basis for clarifying a deed depends in part on the specifics of the parties' agreement. Had there been a written stipulation, such detail might have been included. We find no effort in what was said orally on the record to limit the stipulation to some sort of alternative, e.g., only if the chancellor found an insufficient basis to reform the deed would the agreed boundary be the road. It is clear that the attorney for the Charles DeLoach heirs, immediately after the chancellor accepted the stipulated meaning for the deed description, argued that the inability to locate with certainty the road and railroad mentioned in the deed required reformation to accomplish the intent in the deed for an equal division. The attorney was trying to hold onto the ambiguity issue.
¶ 21. Retaining the issue of deed ambiguity as a basis to require an equal division was rather imprecisely pursued. We do not decide whether this stipulation as to the boundary waived ambiguity as a basis for reforming the deed. It is enough that the chancellor ultimately, despite his earlier uncertainties, had too little in the record on which to base a different conclusion about the location of the boundary. Though the railroad apparently had been abandoned even by the 1930's, the evidence was that the only gravel road that ever traversed west and east on this property in the relevant area was one quite near the present one. A 1930's map showed a similarly-located road; inferentially, that is the road that existed in the 1960's when the parties' father used it as a description. For the chancellor to have rejected this road as the intended boundary, even without the concession by the parties, would have required an assumption based on no evidence that the only discoverable road in the late 1990's was at a different location than the one on the property in the 1960's, and that the earlier road had disappeared without a trace on this unimproved land
¶ 22. With ambiguity unavailable as a basis on which to reform this deed, the issue of mutual mistake being raised by the pleadings and supported by evidence now needs to be addressed. The appellee Wayne DeLoach argued below in his trial brief and repeats here that there never has been a pleading raising mutual mistake. Certain issues must be pled explicitly:
 In all averments of fraud or mistake, the circumstances constituting the fraud or mistake shall be stated with particularity.
M.R.C.P. 9(b). In order for mutual mistake to be a foundation for parol evidence, it should be explicitly pled. Turner v. Terry, 799 So.2d 25, 34 (Miss. 2001). Unless we find trial of the issue by consent, the Charles DeLoach pleadings must have raised the issue of mutual mistake and the resulting need for reformation. We search for relevant pleadings.
¶ 23. There is nothing stated generally, much less "with particularity," in any of these pleadings concerning mistake or the "circumstances" of such a mistake that would support reformation. Instead, there is pleading of ambiguity. At most, Charles DeLoach and his heirs have stated that the intent of the instruments was to make an equal division of the property. That is not, however, an alert to the court or the other party that the deed description failed of its purpose because of mutual mistake. The pleadings sought equity because the deeds were impossible to interpret. *Page 153 
That impossibility was ended by evidence and by agreement.
¶ 24. Pleading insufficiency must also be considered in light of other rules of procedure, which include that matters tried by consent need no pleadings in support. M.R.C.P. 15(b). We thus search for whether the proceedings below consensually considered mutual mistake.
¶ 25. At one hearing, the attorney for the Charles DeLoach heirs stated that due to the vagueness of the deed, he filed a cross bill asking for reformation "so that the effect of the deed that will be created will be the intent that was originally put into the deed." He further stated that "the land is not divided equally by that road . . . But there's a substantial difference between the size of the two pieces of property." Then the attorney for the Charles DeLoach heirs made this assertion:
 And if it states that each one is to convey a quitclaim to the other one-half of the property — and I think you have to read the intention of the deed by what the deed says, and it intends to give each from the other the one-half interest in half the property — then we've got to look at the idea of [reformation] of the deed for a dividing line.
¶ 26. The Charles DeLoach heirs initially relied on vagueness in the deed to support reformation. After the stipulation before the chancellor eliminated ambiguity, the heirs relied on the inconsistency between the location of the deemed boundary and the claimed intent to divide the land equally. The chancellor asked for briefs to determine whether the reference in the deed to "half" overrode the boundary of the gravel road. That is a legitimate legal question but not a factual question. The chancellor noted that distinction: "I think that what we have here is not a factual dispute but a legal dispute" as to what part of the deed description controlled. Does the reference to one-half control, or the described boundary? The canons of construction for deeds make specific boundaries control over acreage and fractions of property.Carvere v. Johnson, 149 Miss. 105, 115 So. 196, 197 (1928) (specific description by metes and bounds controls over general description of "31 acres on east side" of tract); see generally, Jack H. Ewing, "Mississippi Land Descriptions," XVIII Miss. L.J. 381 (1947). The chancellor's final judgment agreed that the deed's reference to half of the 800 acre tract failed as a matter of legal construction to override the specific road boundary.
¶ 27. The chancellor did not request briefs on the issue of mistake, nor had anyone alluded to mistake other than in the most general form. The trial brief for Wayne DeLoach is in the record; any trial brief submitted by the heirs is not. In his trial brief, Wayne DeLoach argued that only a few matters besides ambiguity would justify reformation. He noted that among them was mutual mistake, but that was not pled and could not in this case support reformation.
¶ 28. We find no pleading supporting mutual mistake as a basis for reformation, nor was the issue tried by consent. Modern pleading practice is not overly technical, and notice pleading is usually sufficient. Pleading mistake or fraud requires somewhat more. M.R.C.P. 9(b). Trial by consent can override the pleading failing, but no such consent appears on this record.
¶ 29. It is not as if an obvious issue was overlooked in this case. Even when pled, mutual mistake must be proven beyond a reasonable doubt. McCoy v. McCoy, 611 So.2d 957, 961 (Miss. 1992). Throughout this case, no evidence other *Page 154 
than the use of the word "half" in the deed description conceivably was a foundation for mistake. No evidence from either brother was offered as to his mistaken understanding of the road's location when signing a deed just a few years before the litigation began. After judgment, the Charles DeLoach heirs presented an affidavit as to what Sidney DeLoach meant when he first used the description in the 1960's. However, the unifying of the divided tracts into one parcel in 1994 negated any mistake arising from earlier deeds. The affidavit would have had some relevance had it been shown that the brothers in 1994 were operating under a misunderstanding caused by their father's earlier mistake about the boundary.
¶ 30. To be clear, we recognize that mutual mistake is available to correct a description that is plain and is the one that the parties fully intended to use. "Most mistakes of fact in conveyancing, except those caused by clerical misprision, arise in cases when descriptive terms are intentionally employed under the mistaken impression that they apply to the property sought to be conveyed." Miles v. Miles, 84 Miss. 624,37 So. 112, 115 (1904). As was said over a century ago by Chief Justice J.A.P. Campbell, "where parties contract for a particular result, and intend to effect it, and fail to accomplish it, even through ignorance or mistake of law, equity will effectuate the intent of the parties."Bedford, 622 So.2d at 295, quoting Hall v. State to Use of LafayetteCounty, 69 Miss. 529, 13 So. 38, 39 (1891).
¶ 31. Ambiguity of words is not needed for reformation. However, regardless of some general goal of equity, both DeLoaches must have had a dominant purpose for their 1994 transaction to convey or receive exactly one half of the larger tract, and mutually and mistakenly believed that these obscure landmarks — gravel road, dummy rail line — accomplished that goal. The kind of evidence necessary is exemplified in a conveyance of residential property long ago in the City of Jackson. There was a mutual mistake by the parties as to whether the eastern margin of a driveway was the boundary between two numbered lots, the one on the west having a house and the one on the east being vacant land In fact, the driveway was entirely on the eastern lot and so were other improvements. McGee and Alexander had owned both lots together, but then divided them.
 The valuable improvements were situated on the western side of the two lots, and McGee was interested in buying from his associate the improved premises and in occupying the same as his home. Mr. Alexander was interested in taking over the vacant property at an agreed value and in erecting thereon at his own expense another dwelling house. There was no intimation that the occupation lines of the Sykes lot and premises were to be disturbed. The testimony of McGee and Alexander establish a mutual mistake of fact, and indeed this mistake is admitted.
Brimm v. McGee, 119 Miss. 52, 80 So. 379, 381 (1919). Reformation was ordered.
¶ 32. It may be that additional evidence existed. The Charles DeLoach heirs in a post-judgment motion raised explicitly for the first time that they wished to present evidence on the question of mistake or fraud. It was that motion that attached an affidavit regarding the intent of Sidney W. DeLoach in the 1960's to divide the property equally between his sons. That evidence was relevant but somewhat misdirected, as the mutual mistake issue concerned what the brothers meant in 1994 when they divided the entire 800 acres between them. Perhaps the issue had been just below the surface in the suit, but *Page 155 
it had not been pled nor tried by consent. Even if the chancellor might have been within his discretion to reopen the case, we find no abuse in his refusing to do so.
¶ 33. THE JUDGMENT OF THE TALLAHATCHIE COUNTY CHANCERY COURT ISAFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.
KING, C.J., BRIDGES, P.J., THOMAS, LEE, IRVING, MYERS, CHANDLER ANDGRIFFIS, JJ., CONCUR.
[1] "Dummy lines" were temporary and lightly-built rail lines laid into timber lands during logging operations. Trucks long ago replaced the trains. One authority explained the synergy of sawmills and the railroads: "From these mills, logging railroads radiated outward, like the branches of a tree, to reach the far-flung timber. Known to Mississippians as `dummy lines' because they went nowhere, some reached a length of 30 to 35 miles." Gilbert Hoffman, Dummy Lines Through theLongleaf: A History of the Sawmills and Logging Railroads of SouthwestMississippi (Oxford: Center for the Study of Southern Culture, Univ. of Mississippi, 1992), x. There was evidence proffered in this case that by the 1930's the railroad tracks on this land had been taken up and only some ties and other occasional remnants were visible even then.