ISHEE, J.,
 

 for the Court.
 

 ¶ 1. This case arises from a property line dispute among Will D. (Will) and Jackie Massey (collectively, Masseys) and their neighbor, Joe S. Lewis, in which the chancellor found that a 1996 quitclaim deed vested title to the “hatched area”
 
 [1]
 
 of certain property in Lewis’s predecessor, and subsequently passed title to Lewis. The Masseys contended that they acquired the hatched area by adverse possession and that it was never their intention nor Lewis’s predecessor’s intention to relinquish title to that parcel. Aggrieved, the Mas-seys appeal, asserting:
 

 I. The chancellor erred in holding that the 1996 quitclaim deed from the Masseys to Lewis’s predecessor was without limitations or restrictions and, therefore, passed title to the entire parcel of property as described by the land description in the deed.
 

 II. The chancellor erred in not reforming the 1996 quitclaim deed description to exclude the hatched area, because it was not Lewis’s predecessor nor Masseys’ intention to convey the hatched area.
 

 Finding that the original parties never intended to convey the hatched area, and that the chancellor erred by failing to reform the 1996 quitclaim deed between the Masseys and Lewis’s predecessor, we reverse the decision of the chancellor and render judgment reforming the deed to exclude the hatched area and confirming title to the hatched area in favor of the Masseys.
 

 FACTS AND PROCEDURAL HISTORY
 

 ¶ 2. The Masseys were neighbors of William and Mildred Washington for more than fifty years. Each owned adjoining property in Lauderdale County. The Mas-seys’ property was aligned along the eastern and southern border of the Washing-tons’ property. The legal descriptions that described their respective properties did not overlap but instead shared a common dividing line. From the 1950s to the trial date, the dividing line was represented by an old fence line that ran between the two properties. The old fence line was always considered to be the property line, even though no survey had ever been conducted
 
 *646
 
 on either the Masseys’ or the Washing-tons’ parcel of land.
 

 ¶ 3. In 1992, the Washingtons’ property was sold at a tax sale. The highest bidder was Hot Properties, Inc. After the Wash-ingtons failed to redeem the property within the statutory redemption period, the chancery clerk issued a tax deed to Hot Properties. The tax deed was recorded in the land records office of the Chancery Clerk of Lauderdale County and described the property as follows:
 

 # 9 — B; N ½ S ⅜ SW NW 1/4 LESS 1 A IN NWC & LESS THAT PT S & W RD SECTION 1 TOWNSHIP 7 RANGE 15
 

 ¶ 4. Subsequently, the Masseys noticed a “for sale” sign on the Washingtons’ property and agreed to purchase the property from Hot Properties for $10,000. A quitclaim deed was executed by Hot Properties in favor of the Masseys on December 26, 1994, and recorded with the chancery clerk. The quitclaim deed described the property conveyed to the Masseys as follows:
 

 # 9-B; N ½ S ⅛ SW NW 1/4 LESS 1 A IN NWC & LESS THAT PT S & W RD SECTION 1 TOWNSHIP 7 RANGE 15, LAUDERDALE COUNTY, MISSISSIPPI. PARCEL # 121010000000015, together with all improvements situated thereon and all appurtenances thereunto belonging, being the same interest acquired by Hot Properties, Inc.
 

 [[Image here]]
 

 Approximately three weeks after the deed was delivered to them, the Masseys filed a suit to confirm title. The Washingtons objected and asked for the tax sale and tax deed to be held void on the grounds that they did not receive proper notification. In 1996, the parties reached a settlement in which the Masseys agreed to dismiss the suit and execute a quitclaim deed in favor of the Washingtons in exchange for $7,600. The deed used the same legal description to describe the property as used in the quitclaim deed conveyed to the Masseys by Hot Properties. The validity of the tax sale was not adjudicated by the court. After the settlement, the Washing-tons and the Masseys continued to occupy the same parcels of land as they did prior to the tax sale. During this time, the Masseys constructed a barn and an equipment shed that were located on their side of the old fence line but partially on the hatched area.
 

 ¶ 5. On August 13, 2002, the Washing-tons conveyed their property to Lewis. Two years later, Lewis employed a survey- or to survey the property. This was the first time that the Washingtons’ property had ever been surveyed. Unbeknownst to the Washingtons and the Masseys, Lewis discovered that the old fence was not located on the dividing line described in the deed. Instead, the fence encroached onto Lewis’s property by 1.33 acres. Lewis and Will attempted to reach a compromise by which Will would agree to move the fence. However, the negotiations fell apart after the surveyor staked off the actual property line, and Will realized that the stakes came a great deal further onto his property than he originally anticipated. Will was specifically concerned about the location of three of his buildings that were partially located in the hatched area, as well as access to a creek located on the north side of the property.
 

 ¶ 6. As a result of the failed negotiations, Lewis filed a complaint for declaratory judgment and other relief in the Chancery Court of Lauderdale County naming the Masseys as defendants. In response, the Masseys requested that the chancellor reform the 1996 quitclaim deed description limiting the area of property conveyed to the Washingtons to the old fence line. After hearing the evidence, the chancellor held that, though the Masseys had origi
 
 *647
 
 nally acquired title to the hatched area by adverse possession, they relinquished that title when they reconveyed the property back to the Washingtons by way of the 1996 quitclaim deed. The chancellor also held that the Masseys failed to prove beyond a reasonable doubt that the execution and delivery of the deed resulted from mutual mistake between themselves and the Washingtons. Finding that the deed was unambiguous, the chancellor held that the deed vested title to the hatched area in the Washingtons as of that date; therefore, title passed to Lewis when the Wash-ingtons’ property was conveyed to him. Further, because only eight years had passed between the reconveyance and Lewis’s complaint, the Masseys had failed to reestablish their title by adverse possession under Mississippi’s ten-year adverse possession statute. Therefore, the chancellor confirmed the title to Lewis’s property to include the hatched area. The validity of the 1994 tax deed was not submitted before the chancellor; therefore, he could not find that the deed was void.
 

 STANDARD OF REVIEW
 

 ¶ 7. This Court adheres to a limited standard of review of the decisions of a chancellor.
 
 Nichols v. Funderburk,
 
 883 So.2d 554, 556(117) (Miss.2004). We will reverse only when the chancellor’s determinations were manifestly wrong or clearly erroneous, or when the chancellor applied an incorrect legal standard.
 
 Id.
 
 If substantial evidence supports the chancellor’s fact-findings, this Court must affirm.
 
 Id.
 

 ANALYSIS
 

 I. Whether the chancellor erred in holding that the Masseys’ legal interest in the hatched area passed by virtue of the 1992 tax sale and conveyance of the 1996 quitclaim deed.
 

 ¶ 8. It is undisputed that the Mas-seys acquired title to the hatched area by adverse possession prior to the 1992 tax sale. The issue on appeal is whether the Masseys relinquished their title to the hatched area by purchasing the Washing-tons’ property after the tax sale and subsequently reconveying the property back to the Washingtons in 1996. Lewis argues that the tax sale interrupted the Masseys’ adverse possession claim, and their subsequent conveyance by way of the 1996 quitclaim deed relinquished title to the hatched area. The Masseys argue that the tax sale was void due to improper notice; therefore, no legal interest in the hatched area was conveyed by virtue of the sale. Further, the Masseys contend that it was never their intent to convey the hatched area. Therefore, their adverse possession claim remained ripe, and the Washingtons had no interest in the hatched area to convey to Lewis.
 

 ¶ 9. The Masseys assertion that the tax sale was void is based solely on the Wash-ingtons’ claim in the 1995 confirmation suit that they failed to receive proper notice of the sale. However, because the Masseys and Washingtons subsequently settled the suit, the validity of the tax sale was never adjudicated by the court. The chancellor noted this in his opinion, stating that because the validity of the tax sale was not submitted to him, he could not find that the tax sale was void. The Masseys have offered no other evidence sufficient to suggest that the tax sale was void. Therefore, the chancellor was correct in his presumption that the tax sale was valid.
 

 ¶ 10. Having found that Hot Properties did possess a legal interest in the Wash-ingtons’ property that they then could convey to the Masseys, we must determine whether the Masseys relinquished their
 
 *648
 
 adverse possession claim to the hatched area. The Masseys contend that it was never their intent to relinquish title to the hatched area through the 1996 quitclaim deed. They argue that even if the tax sale was valid, it did not serve as an interruption to the Masseys’ adverse possession claim to the property.
 

 ¶ 11. The Masseys’ intent is largely irrelevant with regard to the effect that the tax sale had on adverse possession. Mississippi Code Annotated section 27-45-23 (Rev.2006) states that when a property is sold for taxes and after the redemption period has expired, the chancery clerk shall execute a deed of conveyance to the purchaser at the tax sale, and that “conveyance shall vest in the purchaser a perfect title with the immediate right of possession to the land sold for taxes.” Further, our supreme court has held that adverse possession cannot operate to vest title while a municipality holds the tax title to the land in question.
 
 Grayson v. Robinson,
 
 240 Miss. 59, 63, 126 So.2d 247, 249 (1961). The supreme court expanded on this point in
 
 Cotten v. Cotton,
 
 203 Miss. 316, 321, 35 So.2d 61, 63 (1948), stating that even if at the time of a tax sale a defendant had acquired perfect title to a disputed strip of land by adverse possession, he could lose that title by permitting the land to be sold for taxes as part of an adjoining tract of land not owned by him.
 

 ¶ 12. As previously stated, it is undisputed that the Masseys had a matured and ripened adverse possession claim to the hatched area prior to the 1992 tax sale, as they had openly maintained ownership of the property for more than fifty years. However, regardless of the extent and quality of the Masseys’ adverse possession, they relinquished their claim when they allowed the hatched area to be sold at the tax sale as part of the Washingtons’ property.
 
 Winstead v. Winstead,
 
 204 Miss. 787, 789-90, 38 So.2d 118, 119 (1948). This effectively tolled the adverse possession period.
 
 Id.
 
 Further, the execution and delivery of the deed from the chancery clerk to Hot Properties, and its subsequent recording, had the effect of removing record title from the Washingtons and vesting it in Hot Properties. Over the next two years, record title was conveyed to the Masseys, who subsequently reconveyed title back to the Washingtons. Therefore, the Masseys had to reestablish their adverse possession claim of the hatched area at the point the property reverted back to the Washingtons. Given that only eight years had passed between the reconveyance and Lewis’s filing of this action, the Masseys’ title to the hatched area had not ripened by adverse possession.
 

 ¶ 13. Under these circumstances, we find that the chancellor did not err in holding that legal interest passed from the Masseys to Lewis by virtue of the 1992 tax sale and 1996 quitclaim deed.
 

 II. Whether the chancellor erred in not reforming the 1996 quitclaim deed description to exclude the hatched area.
 

 ¶ 14. The Masseys contend that the 1996 quitclaim deed should have been reformed to reflect the intentions and expectations of the parties. Specifically, they allege that the deed was conveyed as part of a settlement of them 1995 confirmation suit against the Washingtons, and the deed must be read in conjunction and in light of that settlement. The Masseys claim that the purpose of the settlement was to return to the Washingtons what they lost at the tax sale. They contend that because the Washingtons did not believe that they owned the hatched area before the tax sale, they did not expect to acquire it by the reconveyance after the tax sale. Instead, their conveyance of the
 
 *649
 
 hatched area to the Washingtons was the result of a mutual mistake as to the land description used in the deed.
 

 ¶ 15. It is a well-settled principle that “[w]hen the language of the deed or contract is clear, definite, explicit, harmonious in all its provisions and free from ambiguity throughout, the court looks solely to the language used in the instrument itself, and will give effect to each and all its parts as written.”
 
 Estate of DeLoach v. DeLoach,
 
 873 So.2d 146, 150(¶ 14) (Miss. Ct.App.2004). However, this is not to say that this principle is absolute in all cases. This Court has stated that:
 

 [w]hen, however, the language falls short of the qualities above mentioned and resort must be had to extrinsic aid, the court will look to the subject matter embraced therein, to the particular situation of the parties who made the instrument, and to the general situation touching the subject matter, that is to say, to all conditions surrounding the parties at the time of the execution of the instrument, and to, what as may fairly assumed, they had in contemplation in respect to all such said surrounding conditions, giving weight also to the future developments therein about which were reasonably to be anticipated or expected by them; and when the parties have for some time proceeded with or under the deed or contract, a large measure, and sometimes, a controlling measure, of regard will be given to the practical construction which the parties themselves have given it, this is on the common sense proposition that actions generally speak louder than words.
 

 Id.
 

 ¶ 16. Our supreme court has previously held that its purpose in construing deeds is to reflect the intentions of the parties, stating that it is not always the description of the property that the parties intend to write but rather the property the parties intended to include in the description that controls.
 
 Webb v. Brown,
 
 404 So.2d 1029, 1031-32 (Miss.1981). In
 
 Webb,
 
 Peggy Wiggins and Durwood McGuffie had negotiated a purchase of property from Annie Varnado, who was the original owner of the property.
 
 Id.
 
 at 1031. That conveyance had included three different buildings, but unbeknownst to the parties, the deed included part of a fourth building.
 
 Id.
 
 According to all testimony, Varnado specifically refused to convey title to the fourth building.
 
 Id.
 
 McGuffie later purchased Wiggins’s interest and later sold the identical property to one of the buildings’ tenants, Elizabeth Brown.
 
 Id.
 
 The deed to Brown used the same description as the prior conveyance from Varnado to Wiggins and McGuffie, but it was not intended to include the fourth building.
 
 Id.
 
 Varnado’s heir, McGuffie, and Wiggins sought reformation of the deed to exclude all of the fourth building.
 
 Id.
 
 at 1030. However, the chancellor entered judgment in favor of the Brown.
 
 Id.
 
 On appeal, the supreme court stated that the evidence unmistakably demonstrated that it was the clear intention of Varnado not to convey the fourth building.
 
 Id.
 
 at 1032. The supreme court also found that Brown, who had been a tenant of one of the buildings, was cognizant of the fact that the fourth building was owned by Varnado and not McGuffie.
 
 Id.
 
 Even though the deed description after the survey included part of the fourth building, it was not the description they intended to write that controlled but the property the parties intended to include in the description used.
 
 Id.
 
 Therefore, the supreme court concluded that the evidence demonstrated beyond a reasonable doubt a mutual mistake on the part of the seller and the purchaser.
 
 Id.
 

 
 *650
 
 ¶ 17. The facts of this case are very-similar to those in
 
 Webb.
 
 Although the Masseys technically conveyed their interest in the hatched area by way of the 1996 quitclaim deed, that conveyance was clearly based on a mutual mistake between the Masseys and the Washingtons. The mistake was not in the deed description, having used the same legal description that had always been used to describe the Washingtons’ property. Instead, the mistake was in what the deed description included. It is clear from the record that both the Masseys and the Washingtons believed that the deed description set the old fence line as the dividing line between their properties. For fifty years, both the Masseys and the Washingtons recognized the old fence line as the property line. There is no evidence that the Masseys or the Washingtons ever disputed this belief. In fact, the record reflects just the opposite. Both Will and Washington testified that prior to 2004, no survey had ever been conducted on the property. Instead, they operated under the mistaken assumption that the old fence was the proper boundary line.
 

 ¶ 18. It is also clear from the record that based on their mistaken belief as to the property line, the Masseys and the Washingtons believed the hatched area was part of the Masseys’ property; therefore, they never intended to include it in the deed description. In recognizing that the old fence line was the property line, they recognized that everything to the east and south of the old fence was Masseys’ property. This is reflected by the fact that during the fifty-year period that the Masseys adversely possessed the property, the Masseys had constructed and operated a barn, shop, and an equipment shed on the hatched area without an objection from the Washingtons.
 

 ¶ 19. This mutual mistake is also evident in several factual findings made by the chancellor during the confirmation suit. First, the chancellor noted, “[the Masseys] in 1996 were not aware that any real property south and east of the fence was not included within the real property previously conveyed to them.” Second, “Mrs. Washington did not recall any dispute between her family and the Massey family as to the location of the common boundary lines.... ” Third, the location of the property line was not even discussed during the settlement negotiation. In fact, the Washingtons admitted that they were not aware that any real property located south and east of the old fence was conveyed to them as a result of the settlement. Finally, Will testified that it was never his intent to “give away anything except what [he] got from Hot Properties .... ” Will believed that he had always owned the hatched area and did not receive it as part of the conveyance from Hot Properties. Of even greater significance is the fact that after the deed was conveyed, both the Masseys and the Washingtons went back to occupying their respective properties as they had done before the tax sale. In fact, the Masseys’ possession and ownership of the hatched area was not challenged until Lewis’s survey was conducted eight years later.
 

 ¶ 20. Accordingly, the evidence demonstrates beyond a reasonable doubt that the Masseys’ conveyance of the hatched area to the Washingtons was based on a mutual mistake in the deed description. Moreover, we are of the opinion that had the Masseys known that the deed description included the hatched area, they would have never conveyed it to the Washingtons. As the court held in
 
 Webb,
 
 “[i]t is not what description the parties intended to write but what property the parties intended to have embraced in
 
 *651
 
 the description they used.”
 
 Id.
 
 (quoting
 
 Britmn v. McGee,
 
 119 Miss. 52, 57, 80 So. 379, 381 (1918)). Therefore, the mistake in description in the deed should be reformed to coincide with the description of the property intended to be conveyed. The chancellor erred by not reforming the deed to reflect the Masseys’ and the Washing-tons’ intentions.
 

 ¶21. Finally, we turn to Lewis’s assertion that he was a bona fide purchaser for value without notice, which he briefly mentions in his appellate brief. The evidence does not support Lewis’s argument. Instead it supports a finding that Lewis, who was Washington’s brother-in-law, was cognizant of the fact that he was not purchasing the area south and east of the old fence. The Washington property had been in the family for many years, so we find it reasonable to infer that Lewis knew the location of the old fence line and that it served as the Washingtons’ property line. Lewis also did not conduct a survey of the property before it was conveyed to him. It was not until two years after the conveyance that Lewis conducted a survey and found that the old fence was not located on the deed lines. Furthermore, based on this evidence, the chancellor noted that: (1) “Lewis was surprised at the various distances from the surveyed property line to the fence ... ”; and (2) “[t]hese litigants did not realize the difference in the actual property line and the fence line until the plaintiff employed a surveyor to survey the real property conveyed to him pursuant to the deed.... ”
 

 ¶ 22. The chancellor’s findings indicate that he believed that Lewis was under the impression that the fence line was the actual property line and that the Masseys claimed the hatched area. Such a finding would preclude Lewis from claiming the status of a bona fide purchaser. Under the facts set out above, we cannot agree, based solely on Lewis’s blanket assertion that he was a bona fide purchaser, that he had no notice of the Masseys’ claim to the hatched area. Therefore, a reformation of the deed would be equitable as to all parties. The chancellor’s finding is supported by substantial evidence in the record; therefore, we see no merit to Lewis’s claim that he was a bona fide purchaser.
 

 CONCLUSION
 

 ¶23. Although the Masseys arguably relinquished their adverse possession claim to the hatched area, the evidence clearly shows that they had no knowledge that the hatched area was actually part of the Washingtons’ property. Further, the evidence shows that had they known this, the Masseys would not have conveyed the hatched area to the Washingtons after they acquired record title. Accordingly, we believe that no title vested in Lewis to the hatched area; therefore, he had no interest in the title to such property.
 

 ¶24. Therefore, we reverse the judgment of the chancery court. We render judgment reforming the 1996 quitclaim deed to exclude the hatched area from the deed description and confirming title to the hatched area in favor of the Masseys.
 

 ¶ 25. THE JUDGMENT OF THE CHANCERY COURT OF LAUDER-DALE COUNTY IS REVERSED AND RENDERED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE AP-PELLEE.
 

 KING, C.J., LEE AND MYERS, P.JJ., IRVING, CHANDLER, GRIFFIS, BARNES, ROBERTS AND CARLTON, JJ., CONCUR.
 

 [1]
 

 . The "hatched area,” which is the focus of this dispute, is described in the record as the area of property located between the old fence line and the actual dividing line separating the Massey and Washington properties as described in their respective deeds. Though the Masseys did not truly own this parcel of land, they had openly possessed and occupied it for fifty years without objection from the Washingtons.